Good morning, Your Honors. Joe Escher from the Howard Rice Firm. I'll be presenting for all of the appellants this morning. That's R.J. Reynolds Tobacco Company, R.J. Reynolds Smoke Shop, Inc., and Lorillard Tobacco Company. Your Honors, I wanted to start with a very short quotation, but this one is not from Thomas Jefferson, but rather from the United States Supreme Court. And I quote, First Amendment values are at serious risk if the government can compel a particular citizen or a discrete group of citizens to pay special subsidies for speech on the side that it favors. End quote. The problem with these quotes is that they're taken out of context. And what I would like to understand, because I've spent a lot of time reading all these cases, and you can find strong quotes all along. I am interested, and I think it's a very serious and very difficult case, I am interested what the limits are of your argument, however. You're extrapolating from agricultural cases where the issue is generic advertising. It's a commercial context. What we're talking about here is the government spending tax dollars to educate the public against the evils of smoking, something which you say, if it comes out of the general tax fund, is okay. But because they are using what you say is your money, therefore you have the opportunity, the right to protest it and stop it, stop the use of your money, not stop the advertising. And so my question is, in light of your statements in your briefs, that you're only going after these advertisements. What's the limiting principle to say that if the tobacco companies object to the state's use of what you consider to be your money to go beyond some neutral statement, some fact-based statement, where is the limiting principle for what you're arguing? Well, Your Honor, you suggested one of the first limiting principles, which I do suggest is supported by the case authority. The first one is that we are not objecting to all of the anti-tobacco ads. We are only objecting to But if we write an opinion saying you can attack these ads, that doesn't mean you won't come down the pike or you or some other law firm, some other tobacco company, won't be able and should be able to use whatever principle we're establishing. So what is the principle besides your saying we're only in this case attacking the ads? Well, Your Honor, as we indicated in our reply memorandum, we have taken the position, and I think we judicially have stopped from arguing to the contrary, that a factual ad relating to the dangers of smoking would not be compelled speech that would violate the First Amendment. And we cited, Your Honor, as to the Zoderer case by the United States Supreme Court and the Sorrell case from the Second Circuit Court of Appeals. The notion is that that is, in a sense, a kind of commercial speech. The government can ask a manufacturer to fund a program that tells the populace about the dangers of the product. All right. So if in a classroom a teacher with funds that are attributable to the surtax begins telling his or her students that tobacco is a terrible drug that will poison them and cause them disease, and the tobacco executives are liars because they denied these effects in statements before Congress, and your clients decide that that is over the line, are you saying that there's no principle that would come into play? That would come out of this case attacking the ads that would allow a 1983 suit to be brought against those folks? Yes, Your Honor. And what is it? What is it? The principle is that there's no special tax that's assessed against a discrete group of individuals. No, I'm saying it's the same surtax. The same surtax money being used, not for these ads, but for the hypothetical classroom instruction off a lesson plan that I've just described. Well, of course, Your Honor, those monies aren't, in fact, used in that fashion. I'm not asking you whether they are. I'm asking you what the limiting principle is. Your argument is it's the source of the tax gives the First Amendment rights. So I'm trying to understand. If we focus, as you do, on the source of the monies, once the source of the monies become the key, then don't you have the right then to monitor the uses of those funds as they apply to anything that would be related to the tobacco companies and the sale of tobacco and whether or not they were factual? Just to make sure that I understand Your Honor's hypothetical, if the hypothetical is that the Prop. 99 monies are used for a special program in the public schools that not only teaches children about the dangers of smoking and suggests that tobacco is addictive and that it causes cancer and it's bad for their health, all of which, in fact, does happen in schools, Your Honor, certainly it does in the present time, those things actually happen, that Your Honor is suggesting that the Prop. 99 monies would be used for, for example, a special portion of the program that accuses the tobacco company executives of being liars and actually airs the specific advertisements we're talking about here. It doesn't air the advertisements. It says in substance what the advertisements are. If it's the same substance as the advertisements, Your Honor, yes, we would have a problem with that. Our position is that if you have a narrow group of taxpayers and you have government-compelled speech with a close nexus to those taxpayers and it's not factual commercial speech like, for example, the warning on the package of cigarettes, then there's a compelled speech issue. And, Your Honor, if we could just, you know, of course everyone recognizes that the First Amendment is the same for R.J. Reynolds Tobacco Company as it is for every other citizen. And if we were to move it to the context of, for example, the Summit Medical Center case, which involves abortion providers, our position is that Summit correctly rejected Judge Carlton's reasoning below and basically said that you can't have a situation in which only abortion providers, pay a certain tax and that that money is used by the state to vilify them. So if we had a situation in which the state of Alabama, for example, imposed a tax only on abortion providers and used it to buy billboards that basically said abortionists are child killers and had pictures of chopped up fetuses, that we would consider that to be highly inappropriate and violative of the First Amendment. But if they did that with the general tax, they could do it. Consistent with the First Amendment, Your Honor, yes. I mean, I think by general tax, when you say consistent with the First Amendment, they could do it. What do you intend to include by general tax? Does that exclude excise taxes? I think it would exclude excise taxes, Your Honor. I mean, as we've indicated. No, you cannot use excise taxes for this purpose, period. That's your position. To engage in ñ it depends on how widely the excise tax was imposed. For example, I'm not sure I fully understand whether excise taxes are only imposed on the manufacturers or whether ñ I hope we understand that if we're messing around with it. You don't understand it? I mean, you say ñ you have this ñ you say general tax is okay, excise tax is not. I want to know what you're talking about. Okay. Let me address you very directly on that, Your Honor. I'm not certain I understand how every excise tax is actually implemented. But what I would say is that my general understanding is that excise taxes are paid by manufacturers, which would be a narrow group of taxpayers. And so my position would be that an excise tax used to fund speech by the government that vilifies that group of manufacturers, whether it's tire manufacturers or oil companies or automobile manufacturers, that if we, for example, had an excise tax on ñ But alcohol. The same on alcohol, Your Honor. If we had an excise tax on beer distributors that basically showed photographs of beer executives sitting around laughing while they were looking at pictures of dead teenagers in car accidents, I think that that would be violative of the First Amendment. That is my position. What's the difference between the cigarette tax and the cigarette and tobacco products sewer tax in California? That's the same ñ I believe that to be the same thing, Your Honor. Cigarettes are subject to both the cigarette tax in italics and the cigarette and tobacco products sewer tax. My understanding is that there's already an excise tax on cigarettes in California and that the Prop. 99 taxes are an additional excise tax or sewer tax on top of that. And you're saying none of that can be used in the fashion in which it's being used now? I believe that only the Prop. 99 monies are used in that fashion. I'm actually not at all sure that any of the normal excise taxes are used to fund these sorts of things. What bottom line would you expect to come out of our opinion? We've got to give specific directions. What would you expect those would say? It would say that it would be improper under the First Amendment to impose a tax on a narrow group of taxpayers to fund speech by the government or a quasi-governmental agency with a close nexus to those taxpayers if that message is not factual commercial speech and the messages are objected to by the entities paying the tax. And so, therefore, all of the uses of excise taxes in alcohol, tires, vehicles, petroleum, guns, whatever, anything where they raise a tax by way of excise, which comes out of the manufacturing entity that's being regulated in some fashion, cannot be used unless the statements by the government are factual. For government speech, if it's objected to by the entities paying the taxation. And, therefore, do we import the New York Times standard on actual malice if we're talking about factual? In other words, if they go over the line, are we going to import, as to the government standards, the whole question of whether or not it was done with malice, constitutional malice? I don't think so, Your Honor. But, I mean, once again, I can't be certain that I have thought that through all the way. I mean, as an advocate. Well, I think what you're asking us to do, counsel, is it requires that kind of analysis. With all respect, you are asking us to create, in this case, a ruling which is not predicated on any Supreme Court case as so far addressed this issue. You are analogizing from the agricultural co-op cases or the agricultural subsidy cases. You will concede, will you not, that those are different from now shifting over to government speech? Well, Your Honor, the government speech issue is a very live issue in all of those agricultural subsidy cases. But it hasn't been addressed by the Supreme Court because it wasn't addressed in the United Foods case because the government didn't make the argument. That's right, Your Honor. But it has been addressed in the other Court of Appeals decisions, including the charter case, which has been argued before the Ninth Circuit, and, of course, the livestock case, the frame case. Well, frame was before United Foods. That is correct, Your Honor. That is correct, but the livestock case was not before United Foods. Certainly the government speech issue is a very live issue in the agricultural subsidy cases. Do you have an understanding that any of the money that comes from the cigarette tax goes to the general fund already? But the cigarette tax is opposed to the Prop. 99 surtax. I'm sorry, Your Honor, you were drawing a distinction earlier between the... Well, let me read you from the state board of equalization. Ten cents of the cigarette tax is used for the state's general fund. Did you know that? Yes, Your Honor. All right. So you say general fund money can be used for advertising. Would it be appropriate for them to say, well, if we were to decide in your favor in this case, all right, we'll raise that cigarette tax for how many pennies it takes to fund the anti-tobacco program, and we'll use it out of the general fund, but we'll fund it out of the cigarette tax by increasing that from 10 cents to 15 cents. Would that be all right? It's the general fund paying for it. Your Honor, my view would be that the – it would probably be all right, but I'm once again not certain on all of the considerations that go into the distinctions that Your Honors are trying to raise. And if I could just raise this point for a moment, Your Honors, there are a number of cases that have indicated that the government speech doctrine is really just in its infancy and that the parameters of the doctrine are really still very unclear. And that's why you're asking us to be a court that starts to tell people what those parameters are. That's why we're asking a lot of questions. That is what I'm asking, Your Honor. And I think that with respect to the facts presented by this case, where we have a narrow tax paid only by a very discreet group of people that is being used to fund speech that is not only contrary to their interests but actually vilifies them and is not factual commercial speech about the dangers of cigarettes, that that's the easiest case, Your Honor. And it's also consistent with the summit decision by the District of Alabama that we've cited to, Your Honors. And once again – The summit wasn't a tax. The summit was where they were charging the abortion providers for the materials that they were being compelled. And with all respect to the district court in that case, he decided the case that was before him. But I don't read summit as the be-all, end-all position on government speech. I don't read it as the be-all and end-all either. But, Your Honors, I'd also like to draw your attention to the recent Fifth Circuit decision in the Peltz and Skins case, which I think in a number of respects is highly supportive of the position that the appellants have here, indicating that the issue of government speech is one that needs to take into consideration a variety of factors, including the question of the underlying rationale and, most importantly, whether the tax is assessed against a narrow, discreet group of taxpayers or whether it's a general tax. But, see, that's what's so troublesome about your brief and why we're – at least why I'm pursuing it, is I want to know what the limiting principle is when you say in your briefs, if these ads were put out by the government, out of the general fund, we would not be in this court. It's only because the source of the money being used to – and as I understand from the district court, it's a de minimis amount of money, apparently, that actually comes out of the – to your clients, anyway, for this, is that you can now say our First Amendment rights by this use because it's too narrow. The source of the money is too narrow. The government could tax, the government could do these ads, but they can't just use us as the source. That is what I'm saying, Your Honor. That is consistent with the position that we're taking. Right. Counsel, would your client be able to bring an action under 1983 for libel and slander? It's conceivable, Your Honor. That is a possibility. I mean, we wanted to direct, you know, our argument to the issues that we raised here at the outset. I don't know that we've decided what we would want to do with respect to a possible defamation action. But I don't think that our First Amendment argument in any way turns on whether the statements by the government are true or false. Some of the other arguments may relate to that. No, but why do you say that? You've just been saying that. You said that if – in other words, you're saying that surtax could be used to put these ads out if they were truthful. That isn't what – I'm sorry. What I meant by factual commercial speech, Your Honor, what I meant is, as the case indicates, it's non-controversial speech. So, for example, something that says that cigarette smoking can kill you or you need to stop smoking right now or that the Surgeon General has determined that cigarette smoking is addictive, none of those statements would be implicated by the First Amendment. Well, what about a statement that testimony given before the Congress by X company was false? I think that that would be controversial, Your Honor. Sure, it would be controversial, but it could be true. Whether – that's what I meant by factual. I didn't mean true or false. What I meant was a statement of fact that's non-controversial, and that's what the Zoderer and Sorrell cases talk about. This is a statement of fact that's non-controversial, as I stated it. Well, I think it's controversial, Your Honor. But, once again, the distinction that I'm trying to draw is between factual information about the dangers of a product as opposed to very controversial statements about who's to blame for the health consequences of smoking. Is it the cigarette companies or is it the individuals who smoke cigarettes? I have two minutes. Would you care to use all your time? I'd like to reserve that, Your Honor. Thank you. May it please the Court. Karen Leaf, appearing on behalf of Appellee's, the California Department of Health Services, and the acting director of its Tobacco Control Section. I find it very interesting that this Court has inquired a great deal about the novelty of the First Amendment claim that is being raised here, because while there is quite a growing body of case law concerning free speech challenges to government efforts to compel funding of private speech, the agricultural commodity cases, line of cases being the most prominent example, this is the first time an appellate court has been called upon to address a free speech challenge to the funding of the government's own speech. I suspect that this discrepancy is not the product of happenstance, but is a reflection of a widespread understanding of the First Amendment's guarantee of free speech. What's the purpose of the legislature's program here? The legislature's program is designed to promote tobacco control, to reduce the incidence of tobacco use in the State of California. When I read your brief, it's to destroy the tobacco industry. On page 6, it says California's firm commitment to eliminate tobacco use by promoting a smoke-free society. So it seems to me that the purpose of this is to destroy the tobacco industry. I don't think the purpose is to destroy the tobacco industry. The purpose is to persuade the public in the State of California to either not begin to smoke or discontinue the use of tobacco products. By eliminating smoking. The legislative goal. You're asking the companies to fund their own execution. I think that that's a rather inflammatory characterization. That's kind of what I read from what the legislature has said. We're going to make these people pay in order to put them out of business in California. The tax is designed to reduce. Promote a smoke-free society and to eliminate tobacco use. Right. And the tax itself is earmarked for multiple uses. The bulk of the money actually goes to fund health care services. That's right. But some of the money goes to a campaign to drive them out of business. It's a campaign directed at the public, not at the tobacco industry per se, to persuade the public to discontinue the use of this highly dangerous product. That is correct. The byproduct of which is to get rid of the industry. It's to get past the prevalence of use of tobacco within the state of California. Which apparently the companies don't object to so long as it's factual and not controversial. That, of course, is the attempt that opposing counsel is trying to make. If we're mining history for quotes, I'm immediately taken to the power to tax is the power to destroy. And this begins to sound to me like that. Chief Justice Marshall warned us that a long time ago because we were extremely aware at the founding of the country of the power of the tyranny of the majority. And if you get on somebody's bad list, the power to tax could be used to destroy. So why shouldn't we be worried about that here? I don't think we do need to be worried about that here. The power to tax can be the power to destroy. In fact, it can be the power to destroy free speech. The Minnesota Star and Tribune case being an illustration of where that problem can be real. But there's no suggestion that the tobacco companies are making in this case that any of the speech that the state of California has engaged in has in any way destroyed their ability to conduct business. So you're saying that legislature's purpose is failing so we don't have to worry about it? Well, the tobacco control program certainly can be touted as a program that has been instrumental in reducing the incidence of smoking in the state of California. But there are still a large percentage of our population which uses tobacco products. Well, we haven't yet made tobacco an illegal drug and criminalized it. I suppose that would be, one would think, a way to destroy the industry. But it never seems to be effective. So your approach is to encourage the public to see its own destiny and to quit smoking. That's right. The policymakers in the state of California have elected to use persuasion as an important instrument of public policy in this instance. Of course, tobacco use is regulated. Sales and possession on the part of minors is prohibited. But it is a lawful product that may be used by adults within this state. How do you deal with United Food? You've distinguished it as funding private speech, but Justice Breyer saw it as having broader ramifications, including this case. Right. Without knowing this case was ---- Maybe he was prescient. I don't know. Justice Breyer did in dissent express concern about the potential implications on the ability for government to require an industry such as tobacco to fund the program to educate people about dangerous tobacco use. But he did it, I believe, in a factual context that was similar to that which was present in United Food, some sort of independent body, something that may not be subject to all the political controls that can be expected when the government directly speaks. And that's certainly true here. What we're dealing with is a state agency that is part of the executive branch of the state of California, is funded by the state of ---- excuse me, funded by the California legislature, and is subject to all the normal political controls that attach. Well, what about ---- let's take the principle of this case, if we agreed with you, and the next thing California decides to do is to become like Alabama, anti-abortion. So what they do is they impose a tax, a true tax, an excise tax, on abortion providers, and then they use that tax to basically attack abortion providers as baby killers. The abortion setting, of course, the issue of abortion is one for which there are other constitutional protections that come into play. Any state regulation of abortion that imposes an undue burden on access to abortion will be unconstitutional without regard to First Amendment free speech concerns. I admit ---- What if it's just trying to convince people not to have abortions? There is no doubt that government has a right to engage in speech that is not viewpoint neutral. The Rosenberger case makes that very clear, and that ---- in fact, Casey makes that clear. The states have the right to promote childbirth over abortion as a legitimate public policy. Of course, it cannot do so in ways that rise to the level of an undue burden on a woman's access to abortion. Are there any limitations on the size of the tax that could be used for these purposes? Well, again, I think that that would bring us back into the realm of the Minnesota Star and Tribune case, if you will recall. That is a case in which the State of Minnesota imposed a tax on a small group of newspapers, an ink and paper tax designed to suppress their ability to publish the news. Again, the taxing power at its extreme surely can be used as a tool to suppress speech, and at a certain point it can cross that line. We don't have that here in our case. We have government certainly speaking out, and speaking out rather forcefully, but there's no allegation in this case that the tobacco industry's ability to speak is in any way impaired by the amount of the taxes imposed. What's the total amount of money taken in in California from the cigarette industry off of these excise taxes, the cigarette taxes? I can tell it to you on a per-pack basis. I can't tell you in millions of dollars. There are actually three excise taxes imposed by the State of California on cigarettes and tobacco products. The first is the one that you referenced earlier in the argument. It's a ten-cent tax. That's the one two cents goes to the general fund? Excuse me. Eight of the ten cents goes to the general fund and is available for ‑‑I know, there's a complication. It's available for appropriation by the legislature for any purpose. Of the remaining two cents, there's actually separate legislation that earmarks that two cents for breast cancer research. The legislature decided that it wanted to use the ten cents for that purpose, and there was subsequent legislation to that effect. In addition to that ten-cent excise tax, which I believe was enacted way back in the 50s, then we get Prop 99 passed by the electorate in 1988. That was a 25 cent per-pack excise tax. And then even more recently, there was another ballot initiative, Prop 10, which imposed a 50 cent surtax on cigarettes in the State of California. What's that for? That is earmarked for early childhood education. You may have been familiar with it. It was Rob Reiner's initiative. But you don't know the total amount. So it's 75. Oh, I may be wrong. You know what? It may be 12 cents. For the first one, the 10 goes to the general fund and two cents. It's 87 cents per pack for excise taxes that go to the State of California, and some of them have strings attached to them and some of them don't. But I think that what's important here is that it's really profoundly irrational to create a rule of law that would afford private parties a right to, in effect, censor the government's speech, simply by virtue of the specifics of the funding mechanism. There are a couple of reasons for that. One, the political controls are in place without regard to one part of it. But the whole idea of the First Amendment at one level is to recognize that political controls fail under superheated moments and the majority can run off and do all kinds of crazy things, and that's what the Bill of Rights in large measure is all about, is to tell the majority, we don't care if you have political controls or whatever, these are things that we're simply not going to do. So political controls, that's what the Bill of Rights in the First Amendment was all about, is to override when the public gets carried away with something, which we have decided we're simply not going to let the government get involved with. Right. The rationale for differentiating between government speech and private speech or government restraints on private speech, it's not limited to political controls. There is also, when the government acts to restrain private speech, there is concerns that arise that there's some sort of a nexus between the offender and the speech or the speaker that really is not present when the government itself speaks out, because taxpayers are not assumed to endorse the views of any particular government initiative or government official or whatnot, and that's certainly true in this particular case. No one, when they see the ads on television persuading the public not to smoke or questioning the particular marketing practices of the industry, that that speech is anything but speech by the State of California. There's no reasonable person, and the tobacco companies don't suggest otherwise. But at what moment is that? It's disguised and people don't know where the money is coming from. Where does that get us? Because at the core, the notion that what the First Amendment is protecting is the right of citizens to make choices about when they do and do not speak. Is it fair to see this as a case where the legislature in California has required the tobacco companies to fund an advertising campaign against themselves? Is that a fair characterization of what's happening here? I think that that is not quite a fair characterization. What is that? Because this campaign is not a campaign that is directed at against the industry per se. It is an effort on the part of the people of the State of California to speak to the public. But what about the ad that goes after the executives? What if that personalizes it to or personifies it to companies as opposed to the product? Well, I can understand how you would view it that way. Why wouldn't anybody view it that way? Because the purpose here is to alert the public, to raise the public's awareness of the ways in which tobacco companies attempt to market their products and in particular market their products in ways that cross a legal line. We have a growing body of case law now. In the Henley v. Philip Morris case, which we cited in our brief, but one of a number of examples where public courts have actually affirmed findings and jury verdicts of wrongdoing on the part of the tobacco companies, including marketing to youth, including lying about the harmful properties of cigarettes and concealing the addictiveness of nicotine. It's hardly a surprise that California would want to remind the people of this wrongdoing so that they can recognize. It's the means that's under attack, not the purpose. Right. Is there any other advertising or use of funds for advertising in other industries that California engages in, alcohol, oil, whatever, guns, anything like that, where the source of funds is excised or is targeted to a narrow segment of source and the effect of saying that the state could be called to account for non-factual uses of this money would be implicated by our decision? That's a very good question, and it's certainly a question that troubled me in writing the briefs. What's the answer? To my knowledge, the answer is no, that there is no program in California that can be considered on all fours with the media campaign run by the California Department of Health Services. However, as the Court would be aware from the four amicus letters received by four other states within the Ninth Circuit, Idaho, Arizona, Washington, and Oregon, all those four states have tobacco education programs funded by mechanisms that are sufficiently similar that their state officials have weighed in and expressed concern about the potential application to their programs. I'm not here to represent that I know any of the details of those programs, but there is very much concern in those other states. Is there anything else you want to tell us? No. I'd like to sum up, Your Honor, and submit to the Court that the district court in this instance got it right, that this case was properly dismissed. We ask that the Court establishes the law in this circuit, that government does have the right to speak out even on controversial issues without regard to the specifics of the funding mechanism for its speech, that such activity does not implicate, much less violate, the First Amendment. And we ask that the other claims be the dismissal of the other claims be affirmed on the grounds that the allegations are incurably deficient. Thank you, counsel. Thank you. You have two minutes to respond. Thank you, Your Honors. This is a very unique case. There's no other government program like this in any other state, and I don't believe there's ever been a program like this in the entire history of our republic. Well, it always happens first in California. I guess that's right, Your Honor. Judge Carlton below, and I'm going to have another short quote, which I'm sure is not out of context this time, stated, quote, The government speech doctrine raises profound questions concerning the appropriate role of government in a liberal society. End quote. They are very profound considerations. And when Your Honors asked a question of the government, well, are you really imposing a tax on the tobacco companies to force them to fund speech against themselves, the answer truly was, yes, that is what's happening. But you keep telling us that so long as the money comes out of the general fund, they can do exactly what they're doing. So now you're into content and tracing, are you not? You're going to say that if they substitute the money to pay for these ads to the general fund and some of the cigarette excise taxes go into the general fund, do you still have a claim? I believe now that I've thought about it more carefully, Your Honor, I think the answer is no. And I think the reason for the distinction is, one, first of all, the tracing issue is acknowledged in all of the cases, the agricultural subsidy cases and, of course, the summit case. So that is a relevant consideration. But the other one is that once money is in the general fund, I believe that the democratic considerations about the political process and the different groups in the society trying to say, well, the money should be spent for X rather than for Y, that that ends up being controlling. So just so I understand where you're going with that, if the surtax, the $0.25 per pack was or whatever percentage of it, $0.05 is now shifted over to another excise tax against the tobacco companies. And then that excise tax doesn't go into a segregated fund. It goes into the general fund. And from that general fund, the money will be fully understood. It's going to replace the surtax that we've now held that can't be used. You're okay with that so long as it goes through the general fund? I think the answer is yes, as long as it's not a trick or a nod and a wink. I think the answer is yes, that the money in the general fund would take us into the set of cases that say a general taxpayer doesn't have the ability to veto the government's speech. Legitimate money laundering. I don't know what to say to that, Your Honor. I think that if the money's in the general fund, basically the rule is that taxpayers don't have standing to contest it. But if it isn't, they do. Thank you, Your Honor. Thank you, counsel. The case is argued. Is order submitted? Let me recess until tomorrow morning. All rise. This court for this session stands adjourned. Thank you.
judges: B. Fletcher,trott, Fisher